UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| JAMES CARDWELL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:23-CV-39 JAR |
| ) | |
| MARTIN J. O'MALLEY,[1] ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

Plaintiff James Cardwell brings this action under 42 U.S.C. § 405(g) seeking judicial review of the Commissioner's final decision denying his claims for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.* As explained below, the Court will reverse the decision and remand for further proceedings.

**BACKGROUND**

1. **Procedural History**

On March 10, 2020, and June 29, 2020, Cardwell protectively filed applications for DIB and SSI, alleging disability beginning January 1, 2015. His applications were denied on February 17, 2021, and again upon reconsideration on July 20, 2021. A hearing was held before an administrative law judge (ALJ) on April 21, 2022, where Cardwell amended his disability

---

[1]     Martin J. O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin J. O'Malley should be substituted, therefore, for Kilolo Kijakazi as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

onset date to March 29, 2020.  On May 3, 2022, the ALJ denied Cardwell's claims, finding that vocational expert testimony supported a conclusion that Cardwell could perform jobs that exist in significant numbers in the national economy.

### 2. Medical Records and Other Evidence Before the ALJ

The Court adopts Cardwell's Statement of Uncontroverted Material Facts (ECF No. 13-1) to the extent they are admitted by the Commissioner (ECF No. 14-1).  Regarding Cardwell's testimony, medical records, and work history, the Court accepts the facts as presented in the parties' respective statements of facts and responses. These statements provide a fair and accurate description of the relevant record before the Court.  Additional specific facts will be discussed as necessary to address the parties' arguments.

## LEGAL STANDARD

To be eligible for DIB and SSI under the Social Security Act, Cardwell must prove that he is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

2

The Commissioner engages in a five-step evaluation process to determine whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The first three steps involve a determination as to whether the claimant is currently engaged in substantial gainful activity; whether he has a severe impairment; and whether his severe impairment(s) meets or medically equals the severity of a listed impairment. At Step 4 of the process, the ALJ must assess the claimant's RFC—that is, the most the claimant is able to do despite his physical and mental limitations, *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011)—and determine whether the claimant is able to perform his past relevant work. *Goff v. Barnhart,* 421 F.3d 785, 790 (8th Cir. 2005) (RFC assessment occurs at fourth step of process). If the claimant is unable to perform his past work, the Commissioner continues to Step 5 and determines whether the claimant can perform other work as it exists in significant numbers in the national economy. If so, the claimant is found not to be disabled, and disability benefits are denied.

The claimant bears the burden through Step 4 of the analysis. If he meets this burden and shows that he is unable to perform his past relevant work, the burden shifts to the Commissioner at Step 5 to produce evidence demonstrating that the claimant has the RFC to perform other jobs in the national economy that exist in significant numbers and are consistent with his impairments and vocational factors such as age, education, and work experience. *Phillips v. Astrue*, 671 F.3d 699, 702 (8th Cir. 2012). If the claimant has nonexertional limitations, the Commissioner may satisfy her burden at Step 5 through the testimony of a vocational expert. *King v. Astrue*, 564 F.3d 978, 980 (8th Cir. 2009).

The Court must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389,

401 (1971); *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Jones*, 619 F.3d at 968. Determining whether there is substantial evidence requires scrutinizing analysis. *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007).

The Court must consider evidence that supports the Commissioner's decision as well as any evidence that fairly detracts from the decision. *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010). If, after reviewing the entire record, it is possible to draw two inconsistent positions and the Commissioner has adopted one of those positions, the Court must affirm the Commissioner's decision. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012). The Court may not reverse the Commissioner's decision merely because substantial evidence could also support a contrary outcome. *McNamara*, 590 F.3d at 610.

## THE DECISION OF THE ALJ

At Steps 1 through 3, the ALJ concluded that: (1) Cardwell met the insured status requirement though March 31, 2023, and had not engaged in substantial gainful activity during the period from his alleged onset date of March 29, 2020; (2) Cardwell's severe impairments included degenerative disc disease of the lumbar and thoracic spine, degenerative joint disease of the bilateral knees, osteoarthritis of the right shoulder, chronic obstructive pulmonary disease (COPD), obesity, major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder; and (3) these impairments did not medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P. At Step 4, the ALJ found Cardwell had the RFC to perform light work with the following additional limitations:

> He can frequently climb ramps, stairs, ladders, ropes and scaffolds, frequently balance, stoop, kneel, crouch and crawl, and can frequently reach using the right upper extremity. He must avoid concentrated exposure to dust, odors, fumes and pulmonary irritants. He can perform only jobs that can be learned in 30 days or less,

> can make only simple work related decisions, and can tolerate only occasional contact with co-workers, supervisors and the general public.

Tr. 34.  In reaching this conclusion, the ALJ considered medical opinion evidence from two state agency medical consultants, Drs. Eunice Gititu and Donald Nelson.  Tr. 92-93, 112-113.  As explained in further detail below, the ALJ did not find these opinions persuasive.  Considering Cardwell's RFC, age, education, and past relevant work, the ALJ found vocational expert testimony supported a conclusion that Cardwell could perform work as it exists in significant numbers in the national economy as a Housekeeper, Product Assembler, and Hand Cleaner.  The ALJ accordingly found that Cardwell was not under a disability.

## Discussion

Cardwell argues that the ALJ improperly evaluated opinions from Drs. Gititu and Nelson.  In February and July 2021, these examiners opined, among other things, that Cardwell could stand or walk no more than two hours in an eight-hour workday.  The ALJ found these opinions unpersuasive because they were inconsistent with the record, and he instead limited Cardwell to the light exertion level.  That exertion level requires "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."  SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983); *see* 20 C.F.R. §§ 404.1567(b), 416.967(b).  Cardwell argues that the ALJ failed to explain how the record was inconsistent with Drs. Gititu and Nelson's conclusions or otherwise explain what evidence supports a conclusion that Cardwell can stand or walk six hours in an eight-hour workday.

Evaluation of medical opinion evidence is governed by 20 C.F.R. §§ 404.1520c and 416.920c.  Under those regulations, ALJ's must consider all medical opinions equally and evaluate their persuasiveness according to several factors such as supportability, consistency, the medical source's relationship with the claimant, and specialization.  §§ 404.1520c(c),

5

416.920c(c).  Of these, supportability and consistency are the most important factors.  Accordingly, the ALJ must "explain how [he] considered the supportability and consistency factors" in their decision.  §§ 404.1520c(b)(2), 416.920c(b)(2).

The ALJ inadequately explained how he considered these factors when evaluating the opinions of Drs. Gititu and Nelson.  Here is the entirety of the ALJ's analysis of these opinions:

> [T]hese opinions are not persuasive.  Although Drs. Nelson and Gititu attempted to support their conclusions with analysis of the evidence available when the opinions were rendered, the totality of the record—including the claimant's own statements regarding his abilities to complete many activities of daily living—does not support a limitation for reduced standing/walking below that required of the light exertional level.  Further, at least some additional limitations are warranted—such as the need to avoid pulmonary irritants given the claimant's COPD and related breathing troubles.

Tr. 37.

While this discussion contains the word "support," the ALJ does not analyze the supportability of Drs. Gititu and Nelson's opinions at all.  Supportability means the degree to which the examiner substantiated their conclusions with objective medical evidence and supporting explanations.  *See* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).  "[A]n opinion is more persuasive if it presents more relevant objective medical evidence and explanatory rationale in support of the opinion."  *Morton v. Saul*, No. 2:19-CV-92 RLW, 2021 WL 307552, at *7 (E.D. Mo. Jan. 29, 2021).  Here, the ALJ merely notes that the doctors *attempted* to support their opinions; he does not analyze whether or to what degree they were successful in doing so.  The ALJ seems to imply that evidence produced after Dr. Gititu and Nelson rendered their opinions casts doubt on their conclusions, but he does not explain what that evidence is or how it affects Drs. Gititu and Nelson's conclusion regarding Cardwell's ability to stand and walk.

The ALJ's analysis of the consistency of these opinions with the record does not fare much better.  Consistency refers to the agreement between the examiner's conclusions and

6

evidence in the record. "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2); accord 20 C.F.R. § 416.920c(c)(2). Here, the ALJ summarily claims that Gititu and Nelson's opinions are inconsistent with the evidence in general, and he makes reference to Cardwell's statements about his daily activities. But he does not explain or specify what evidence or which of these activities is inconsistent with the ability to stand and walk for only two hours in an eight-hour workday. "While an ALJ's explanation need not be exhaustive, boilerplate or 'blanket statements' will not do." *Lucus v. Saul*, 960 F.3d 1066, 1069 (8th Cir. 2020). The explanation must be "sufficiently specific to make it clear to any subsequent reviewers." *Id.* quoting SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). The explanation offered here does not meet that standard. *Cf. Martini v. Kijakazi*, No. 4:20 CV 1711 CDP, 2022 WL 705528, at *4 (E.D. Mo. Mar. 9, 2022) (finding the ALJ's explanation that "the findings about the claimant's physical and psychological impairments are consistent with the record as a whole" was an insufficient "blanket statement"); *Post v. Kijakazi*, No. 4:20-CV-315 RLW, 2021 WL 4355349, at *7 (E.D. Mo. Sept. 24, 2021) (finding the ALJ's explanation that an expert's opinion is "significantly persuasive as it is consistent with the claimant medical record" was an insufficient "blanket statement"); *Hirner v. Saul*, No. 2:21-CV-38 SRW, 2022 WL 3153720, at *7 (E.D. Mo. Aug. 8, 2022) (finding the ALJ's explanation that an opinion is "persuasive only to the extent that his recommended restrictions are consistent with the limitations detailed in the [RFC] finding above" was an insufficient "blanket statement"). As a result, the Court is left to speculate as to the ALJ's reasoning.

7

Defendant argues that the ALJ's discussion of the opinion evidence cannot be read in isolation, and the ALJ discussed Cardwell's activities of daily life earlier in his decision. The Court agrees, but "[n]o matter the adequacy of the ALJ's general summary of the evidence of the record," § 404.1520c requires the ALJ to "explain" the supportability and consistency of the opinion in light of that evidence. *Martini*, 2022 WL 705528 at *5; *see also Lucus*, 960 F.3d at 1070 ("The failure to comply with SSA regulations is more than a drafting issue, it is legal error."). Thus, even if the ALJ thoroughly recited Cardwell's statements about his activities of daily life earlier in his decision, he was required to explain how those activities were inconsistent with Drs. Gititu and Nelson's opinions to satisfy his duty to articulate his reasoning.

In any event, it is entirely unclear how the daily activities described by the ALJ conflict with the limitation espoused by Drs. Gititu and Nelson. The ALJ's discussion merely describes Cardwell's activities—not the frequency with which he can do them:

> Despite these allegations, the claimant remains able to participate in many typical activities of daily living. He testified he can cook but may forget things – such as how to boil an egg – and cleans but has someone help him, providing an example of his back hurting when trying to bend over and use a dustpan. He can grocery shop but leans on the cart while doing so and states he is limited in the weight of groceries he can carry at one time. The claimant mows his lawn with a push mower, taking breaks after 30 minutes of mowing, and works on his home but may have assistance in doing so. In his function reports, he relayed he prepares meals, cares for pets (when he remembers to do so), pays bills and counts change, shops in stores and online, and spends time with others, but denied driving, indicating his anxiety and "road rage" kept him from doing so. Also of note, the medical record shows he reported playing video games on his phone, watching television, working on his house and mowing the yard (Exhibits 3F/224; 4F/44; 5F/34; 10F/60). He told the consultative examiner he[] was able to independently complete his activities of daily living (Exhibit 6F).

8

Tr. 35.  Whether or not Cardwell is capable of activities that involve standing or walking—such as cooking for himself,[2] shopping in stores,[3] working on his home,[4] mowing his lawn,[5] or caring for pets[6]—has little to do with whether he can do those activities for six hours in an eight-hour workday.  As the Eighth Circuit has frequently remarked, "a claimant need not prove she is bedridden or completely helpless to be found disabled," and "the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full time competitive work."  *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (quoting *Burress v. Apfel*, 141 F.3d 875, 881 (8th Cir. 1998)).  Drs. Gititu and Nelson even discussed these activities in their opinions and nonetheless found that Cardwell should stand or walk no more than two hours.  Trs. 113 and 93 ("[C]laimant reported he cares for pets and his knee and back pain him keeping him up for hours [sic].  He said he sometimes has trouble getting up off toilet due to his knee.  He prepares meals, does laundry and dishes, sometimes mows and shops autonomously. . . . He can lift 20 lbs and reported using a cane and a brace.").

---

[2]   In his function reports, Cardwell explained that he prepares "veggies and dips, frozen dinner, ready made salads, ready made microwaveable meals" on a weekly basis.  Tr. 313; *see also* Tr. 333 ("usually microwave meals or quick fix meals. Skillet meals wraps. . . . once daily.")

[3]   In his function reports, Cardwell explained that he shops for "food mostly and clothes with help . . . once a month or 4 times a month."  Tr. 314; *see also* Tr. 334 (explaining that he shops for "groceries. Bleach . . . once a month if possible but no more 7 times a month.")

[4]   In his function reports, Cardwell explained, "cleaning is behind laundry is behind dishes behind mowing is done by cop/ticket motivation. House repairs behind."  Tr. 313; *see also* Tr. 333 ("it takes hours for anything even dishes due to arthritis in my body.  Yard work can take most of the day have to take breaks.")

[5]   Again, Cardwell explained in his function reports, "I do yard work just takes me time to do it."  Tr. 313; *see also* Tr. 333 ("I do laundry or mowing, any yard work once a week cause bending over during week to put on shoes, pants and underwear make it difficult.  Lose track of what I'm doing due to pain.")

[6]   Cardwell explained that he tries to "feed them and get water when [he] remember[s] to."  Tr. 312; *see also* Tr. 332 ("Try to remember to feed at set time" with help.)

9

The failure to specify how Drs. Gititu and Nelson's limitation is inconsistent with the record is critical because, as Cardwell underscores, the ALJ did not explain the basis for his conclusion that Cardwell can stand or walk for most of the workday. He merely noted that "the [RFC] above which limits claimant to light exertional work with additional limitations more than adequately accounts" for impairments stemming from his obesity. Tr. 36-37. And in his summary of his RFC assessment, he notes "the claimant is limited to a light exertional level to account for reduced lifting/carrying." Tr. 37-38. In other words, he did not discuss and describe "how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Sieveking v. Astrue*, Case No. 4:07 CV 986 DDN, 2008 WL 415674, at *9 (E.D. Mo. Sept. 2, 2008) (quoting S.S.R. 96-8p, 1996 WL 374184, at *7 (July 2, 1996)).

In his opposition memorandum, Defendant does not explain what evidence supports the ALJ's conclusion that Cardwell can perform the standing and walking requirements of light work. He does not explain how the ALJ analyzed the supportability factor. And he does not explain how Cardwell's activities of daily life contradict Drs. Gititu and Nelson's assessment. He merely reiterates the ALJ's statements about Cardwell's activities of daily life, claiming: "This evidence is inconsistent with the prior administrative medical findings that he was limited to only 2 hours of standing and/or walking (with normal breaks) during an 8-hour workday." ECF No. 14 at 7. Because an ALJ's failure to address either the consistency or supportability factors requires reversal, the Court must reverse and remand to the Commissioner for further evaluation of Drs. Gititu and Nelson's opinions. *See Bonnett v. Kijakazi*, 859 Fed. Appx. 19 (8th Cir. 2021).

Accordingly,

10

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED**, and this case is **REMANDED** for further proceedings.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this 12th day of September 2024.

JOHN A. ROSS
UNITED STATES DISTRICT JUDGE